IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

JON STRINGFIELD,           *
                           *
          Plaintiff,       *
                           *
     v.                    *       CV 109-88
                           *
IAP WORLD SERVICES, INC.,  *
                           *
          Defendant.       *

# ORDER

On June 23, 2009, Plaintiff Jon Stringfield ("Plaintiff") filed a complaint in the Superior Court of Richmond County, Georgia, alleging that Defendant IAP World Services, Inc. ("Defendant" or "IAP") committed libel and slander against him. (Doc. no. 1.) Defendant removed the action to this Court and subsequently filed a motion for summary judgment (doc. no. 21) and a motion to strike the affidavit of J. Patrick Arthur (doc. no. 51), which are both presently pending before the Court. The time for filing materials in opposition to these motions has passed, and the motions are now ripe for consideration.[1]

---

[1] The Clerk gave Plaintiff appropriate notice of Defendant's motion for summary judgment and informed him of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. no. 23.) Thus, the notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), have been satisfied.

# I. BACKGROUND

## A. Plaintiff's Employment with IAP and Subsequent Termination

IAP is an international corporation that provides general support services for military installations. In early 2007, IAP was the prime contractor at Fort Gordon, Georgia ("Fort Gordon"). (Stringfield Dep. at 41.) As the prime contractor, IAP served two major functions on base: public works and logistical support. (Id. at 41-42.) IAP's public works function included, *inter alia*, the maintenance of buildings, the heating and cooling systems ("HVAC"), and the sewage treatment facility. (Id.; Fulbright Dep. at 9 & 14.) In terms of logistical support, IAP's services included oversight of supply operations, vehicle maintenance, and transportation. (Stringfield Dep. at 41-42; Fulbright Dep. at 9 & 14.)

In August of 2007, IAP hired Plaintiff to serve as its operations manager at Fort Gordon. (Stringfield Dep. at 39 & 49.) Shortly after IAP hired Plaintiff, AKIMA, a native-Alaskan corporation that also provides support services for military installations, secured a cost-plus base operations contract[2] directly with the Department of the Army as a result of its status as a minority-owned business; AKIMA then became the new

---

[2] A "cost-plus contract" is one in which the contractor is reimbursed for allowable billable costs and a base fee and an awards fee are built into the contract. (Fulbright Dep. at 14.) This stands in contrast to a "fixed-price contract" in which a contractor is paid a specified amount no matter what the cost of the project. (Id.)

2

prime contractor at Fort Gordon. (Fulbright Dep. at 10-13; Ramey Dep. at 10; Stringfield Dep. at 40-41.) AKIMA retained IAP as a subcontractor, which remained responsible for the public works portion of the contract; AKIMA took over logistical support. (Stringfield Dep. at 41-42.) Despite this division of responsibility, AKIMA maintained ultimate authority over the contract and held all rights regarding overall management. (Ramey Dep. at 14.)

*1. Relevant Personnel*

When AKIMA emerged as the prime contractor at Fort Gordon, nothing changed with regard to Plaintiff's position as IAP operations manager. (Stringfield Dep. at 39.) He continued working for and reporting to Rick Underwood ("Underwood"), who remained the on-site project manager for IAP. (Id. at 50.) AKIMA, however, brought in its own, separate on-site project manager, John Fulbright, to oversee the entire Fort Gordon contract. (Fulbright Dep. at 9.)

Employees of IAP and AKIMA worked regularly with the individuals within the Department of the Army who were responsible for overseeing and coordinating the various activities covered by AKIMA's contract. These individuals included John Ramey ("Ramey"), the Director of Public Works at Fort Gordon. (Ramey Dep. at 9.) Ramey's responsibilities included the maintenance and repair of the post's real property

3

assets. (Id.) He supervised various employees, including Glenn Stubblefield ("Stubblefield") and J. Patrick Arthur ("Arthur"). (Id. at 35.) Arthur served as the Facilities Manager at Fort Gordon and was a "first responder" who had direct contact with contractors when an emergency occurred on post. (Id.) He reported directly to Stubblefield, the Operations Maintenance Division Chief. (Id.)

*2. HVAC Failure*

On or around June 14, 2008, an HVAC problem developed on-post at Building 24402, causing room temperatures to rise to nearly ninety degrees. (Id. at 30-35.) Stubblefield informed Ramey of this problem, and Ramey received authorization to direct the contractors to purchase free-standing air conditioning units; Stubblefield then relayed the message to Underwood who passed it along to Plaintiff. (Id.; Stringfield Dep. at 142.)

Plaintiff contacted Scott Pearson of A Chuck's Heating and Air Conditioning, an organization on the approved vendor list for the Fort Gordon project, who he referred to Underwood, the IAP employee with the authority to purchase the air-conditioners. (Stringfield Dep. at 145; Fulbright Dep. at 32.) Underwood purchased the air conditioners, and they were promptly

4

placed on-post at Fort Gordon.[3] (Stringfield Dep. at 90 & 141; Ramey Dep. at 36.)

### 3. Procurement Investigation, Plaintiff's Termination

On October 9, 2008, law enforcement officials arrested Michael Waters, IAP's supervisor of the heating and cooling plant and an individual who reported directly to Plaintiff, for solicitation and acceptance of a "kickback" while employed on-post with IAP. (Stringfield Dep. at 50 & 57; Doc. no. 57 at 85.) A month later, on November 19, 2008, the Procurement Fraud Branch of the Department of the Army sent IAP a show cause letter threatening the sanction of debarment from future contracts with agencies of the executive branch of the United States Government. (Doc. no. 47, Ex. 1 at 2.)

IAP then began an investigation into the entire Fort Gordon procurement process. (Stringfield Dep. at 109.) During the course of this investigation, IAP learned of the June 2008 $11,200.00 contract for the purchase of free-standing air conditioners that was not subject to competitive bidding. (Id. at 140-41.) IAP also learned that Scott Pearson, the vendor who received the contract, was the husband of an IAP employee. (Id. at 130.) IAP determined that this acquisition was in violation of company procurement policies and created, at the very least,

---

[3] The acquisition of the air conditioners was never subject to competitive bidding. (Stringfield Dep. at 141.)

5

the appearance of impropriety.  (Id.)  By letter dated February 10, 2009, IAP terminated Plaintiff's employment.  (Doc. no. 48, Ex. 1 at 2.)

### B. Plaintiff's Libel and Slander Claims

In the letter terminating his employment, IAP stated the following:

> As a result of an extensive investigation into the procurement activity at the Fort Gordon Installation Support Project ("FGIS"), IAP management has determined that your willful neglect of the procurement policies of IAP shall result in the immediate termination of your IAP employment.
>
> This decision is based on the following investigative findings:  (1) Your failure to follow IAP ("the company") procurement policy, including your failure to recognize and avoid basic conflicts of interests, competition, favoritism, fraternization, and; your additional failure to adhere to the Company's ethics requirements.  (2) Your poor judgment exercised as Facilities Operations Manager in the procurement of products from A Chuck's Air Conditioning.  (3) Your admission that you would circumvent IAP procurement practices again if presented with with [sic] the same exigent procurement situation that was noted in your use and procurement approval of A Chuck's services.
>
> Although your actions have placed the company at serious risk, including a current determination before the U.S. Army Procurement Fraud Branch that will govern IAP's continuing ability to perform on U.S. Government contracts, IAP provides you with the opportunity to immediately resign your employment. Should you choose not to resign, IAP will summarily terminate your employment, with prejudice.

(Id.)

According to Plaintiff, during the course of his termination, five different IAP employees reviewed this letter, including: Ruth Tomlin, a secretary in the Human Resources Department; Rick Underwood, the Fort Gordon project manager and Plaintiff's direct supervisor; Mark Gow, Human Resources Director; David Toops, Vice-President of Army Operations; and Jacquelin Humphries, the Human Resources Manager.[4] (Stringfield Dep. at 64.) Plaintiff also contends that IAP orally published the contents of this letter to three individuals outside of IAP: Fulbright, AKIMA's project manager at Fort Gordon; Christy Harvey, his secretary; and Arthur, the Facilities Manager for the Department of the Army at Fort Gordon. (Id. at 71-84.)

Plaintiff's slander claims arise, in part, from his pursuit of employment after his termination from IAP. Not long after Plaintiff's termination, Fulbright posted a project coordinator position for AKIMA. (Fulbright Dep. at 46.) Plaintiff applied for this position, but was informed by Fulbright that AKIMA could not hire Plaintiff due to his previous termination by IAP. (Id. at 47.) Plaintiff contends Fulbright said that his bosses

---

[4] David Toops is listed as the author of the letter (doc. no. 48, Ex. 1 at 2), and he, together with Mark Gow, delivered it to Plaintiff (Stringfield Dep. at 67). Plaintiff asserts that Ruth Tomlin learned of the contents of the letter as a result of her presence in the office where the letter was drafted and through her creation of photocopies of the letter for Mark Gow and David Toops. (Id. at 64.) As to Underwood, Plaintiff contends that he was present in the room when Plaintiff received the letter on February 10, 2009. (Id. at 67.) Plaintiff states that Humphries learned of the contents of the letter the same day, when she made Plaintiff a copy of the letter. (Id. at 70.)

had been told by individuals at IAP that Plaintiff could not be trusted.[5] (Stringfield Dep. at 77; Fulbright Dep. at 47-48.) The next day, Fulbright's secretary called to check on Plaintiff, and Plaintiff informed her of his previous conversation with Fulbright. (Stringfield Dep. at 84.) Fulbright's secretary responded by stating that she had already heard about the conversation, but Plaintiff is unable to say from whom she received this information. (Id. at 84-85.)

The other basis for Plaintiff's slander claims arises from communications allegedly made to Arthur, the Facilities Manager at Fort Gordon and an employee of the Department of the Army. (Doc. no. 48, Ex. 1 at 1.) Plaintiff has submitted an affidavit from Arthur in which Arthur states that, a short time after Plaintiff's termination, Chuck Dominey, a man who represented himself as an officer and agent of IAP, relayed to him the facts that formed the basis of Plaintiff's termination. (Id.)

### C. Pending Motions

Defendant filed its motion for summary judgment on April 9, 2010. (Doc. no. 21.) In its motion, Defendant argues that Plaintiff's claims against it fail because, among other things,

---

[5] Defendant has asserted that Fulbright's testimony on this issue is hearsay and should not be considered on summary judgment. (See Doc. no. 53 at 7-8.) The Court's reference to these conversations should not be construed as a ruling as to the admissibility of these statements, but rather as an attempt to set forth all the facts relevant to Plaintiff's case.

8

the statements identified as the basis of his claims: (1) were true; (2) were not "published;" (3) were not authorized by IAP; (4) were merely statements of opinion; and/or (5) were subject to a qualified privilege that Plaintiff cannot overcome. (Id.) Defendant has also filed a motion to strike Arthur's affidavit (doc. no. 51), but the Court does not reach the merits of this motion in light of the fact that judgment as a matter of law is warranted regardless of whether Arthur's affidavit is considered.

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Cntys., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of

10

proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

### III. DISCUSSION

#### A. Allegations Surrounding Statements to IAP Employees

Defendant argues in its motion for summary judgment that, with regard to Plaintiff's libel claims, "no defamation can be made when the alleged statement [sic] are made to employees of the company for which Plaintiff works who are authorized to

11

receive the information, such as Human Resource personnel and Plaintiff's supervisors." (Doc. no. 21 at 10.) Plaintiff has provided no response in opposition to Defendant's motion as to these particular claims.[6] Based upon Defendant's arguments and Plaintiff's failure to respond in opposition, the Court finds summary judgment is proper as to Plaintiff's libel claims.

"In order to recover for libel or slander, a plaintiff must show that the offending statement was 'published,' or communicated to another person. However, when the communication is intracorporate, and is received in the course of a duty or by virtue of an authority, there is no publication." Atlanta Multispecialty Surgical Assocs., LLC v. Dekalb Med. Ctr., Inc., 273 Ga. App. 355, 357 (2005) (citations omitted); see also M.S. Koly v. Enney, 269 Fed. Appx. 861, 864 (11th Cir. 2008) ("Georgia law provides a well-established 'exception to the broad definition of publication. . . . [W]hen the communication is intracorporate . . . and is heard by one who, because of his/her duty or authority has reason to receive the information, there is no publication.'" (quoted source omitted)); Saye v. Deloitte & Touche, 295 Ga. App. 128, 133 (2008) ("'The legal fiction that no publication has occurred when [statements are purely intracorporate] . . . is based on the sentiment that . . . [intracorporate] statements are the legal equivalent of

---

[6] "Failure to respond within the applicable time period shall indicate that there is no opposition to a motion." S.D. Ga. L.R. 7.4.

12

speaking only to one's self.'" (quoted source omitted)); McClesky v. Home Depot, Inc., 272 Ga. App. 469, 471-72 (2005) (applying intracorporate exception to broad definition of publication in defamation case); Galardi v. Steele-Inman, 266 Ga. App. 515, 575 (2004) (same).

Plaintiff made clear during his deposition that the only individuals who viewed his termination letter—that he knew of—were IAP employees who had good reason to receive the information as a result of their positions within the company. Most of these employees worked in the human resources department or held positions of authority within the organization, and all identified employees had a direct, business-related connection to Plaintiff's termination.[7] For example, Underwood was not only involved in the events that formed the basis of Plaintiff's termination (Stringfield Dep. at 145), but Plaintiff reported directly to him (id. at 50). Because he was project manager and Plaintiff's direct supervisor, IAP had good reason to inform him of the basis of Plaintiff's termination.

Not only has Plaintiff failed to respond to Defendant's arguments regarding all claims that may exist as a result of the disclosure of Plaintiff's termination letter to IAP employees—

---

[7] The Court notes that among these employees, only one, Ruth Tomlin, appears not to have held an executive or managerial position at IAP. (See Stringfield Dep. at 64-70.) Even as to her, however, there was a perfectly legitimate occupational-based reason for how she came about the information regarding Plaintiff's termination. Tomlin worked as a secretary in the human resources department and, in that role, received and handled Plaintiff's termination letter for the sole purpose of making photocopies. (Id. at 65.)

drawing into question whether he intends to continue pursuing these claims—but there is also no evidence of any legally sufficient publication, which is required under Georgia law. The evidence before the Court, even when considered in the light most favorable to Plaintiff, overwhelmingly supports Defendant's contention that the disclosures to IAP employees were warranted in light of the individuals' positions and job descriptions; Plaintiff neither points to nor provides any evidence to the contrary. Accordingly, Defendant's motion for summary judgment as to Plaintiff's libel claims, based upon the statements made to IAP employees, is hereby **GRANTED**.

### B. Allegations Surrounding Statements to AKIMA and the Department of the Army

Plaintiff also contends that IAP orally "published false unprivileged statements about Stringfield" to both employees of AKIMA and the Department of the Army. (Doc. no. 26 at 15-17; Stringfield Dep. at 71.) In its motion for summary judgment, IAP argues, *inter alia*, that there is no evidence that any of these alleged statements were affirmatively authorized by IAP, and, thus, IAP is entitled to judgment as a matter of law. (Doc. no. 21 at 13.) The Court agrees.

Georgia courts have expressly stated on numerous occasions that respondeat superior does not apply in slander cases. See

Desmond v. Troncalli Mitsubishi, 243 Ga. App. 71, 75 (2000) ("'[T]he doctrine of respondeat superior does not apply in slander cases, and a corporation is not liable for the slanderous utterances of an agent acting within the scope of his employment, unless it affirmatively appears that the agent was expressly directed or authorized to slander the plaintiff.'" (quoted source omitted)); see also Smith v. Trust Co. Bank, 215 Ga. App. 413, 416 (1994) (same); Gerald v. Ameron Auto. Ctrs., 145 Ga. App. 200, 201 (1978) ("Georgia's law has stubbornly clung to the notion that a corporation must expressly authorize its agent's slander, or it will have no liability."). The Georgia Court of Appeals has stated the following with regard to claims of corporate slander:

> "A corporation will not be liable for any slander uttered by an officer, even though he be acting honestly for the benefit of the company and within the scope of his duties, unless it can be proved that the corporation expressly ordered and directed that officer to say those very words: for a slander is the voluntary and tortious act of the speaker. As a corporation can act only by or through its agents, and as there can be no agency to slander, it follows that a corporation cannot be guilty of slander; it has not the capacity for committing that wrong. If an officer or an agent be guilty of slander, he is personally liable, and no liability results to the corporation."

Ray v. Am. Legion Auxiliary, 224 Ga. App. 565, 566 (1997) (quoted source omitted).

As to the issue of corporate slander, Plaintiff only provides argument in support of a single claim and cites no

15

legal authority in support thereof.[8] Plaintiff's one argument in opposition to Defendant's contention that there is no evidence of corporate authorization is based upon Arthur's affidavit, within which Arthur states that a man named Chuck Dominey, who represented himself as an officer and agent of IAP, told him about Plaintiff's termination. (Doc. no. 26 at 17; Arthur Aff. ¶ 8(a).) Plaintiff asserts in opposition to summary judgment that "it appears that Mr. Dominey serves in a leadership position within IAP's corporate structure as the entity's Vice President of Government Affairs." (Doc. no. 26 at 17.) According to Plaintiff, a reasonable juror could infer from Dominey's position alone that he had express direction or authority to slander Plaintiff. (Id.)

Georgia authority appears to be in direct conflict with Plaintiff's position. As set forth above, Georgia courts have expressly held that a corporation shall not be liable for slander committed by "an *officer*, even though he be acting honestly for the benefit of the company and within the scope of his duties, unless it can be proved that the corporation expressly ordered and directed that officer to say those very words." Ray, 224 Ga. App. at 566 (emphasis added); see also Sims v. Miller's, Inc., 50 Ga. App. 640, 640 (1935) ("If it

---

[8] The Court notes that, at least with regard to Plaintiff's allegations arising out of Defendant's alleged disclosure to AKIMA employees, Plaintiff is unable to even identify the specific individual at IAP who made the alleged statements.

affirmatively appear that a slanderous utterance was made by an officer, agent, or servant by the direct authority or direction of the corporation or that it was made by the alter ego of the corporation, the corporation would be liable. 'The president of a corporation is presumed to be its alter ego,' but 'no such presumption exists in favor of any other official.'" (quoted source omitted)).

For example, in Anderson v. Hous. Auth. of Atlanta, 171 Ga. App. 841, 841 (1984), an employee of the central maintenance facilities of the Housing Authority of the City of Atlanta accused the organization of slander based upon statements released to the media by its acting executive director. Despite the director's position within the organization and evidence that the housing authority frequently spoke by and through this individual, the Georgia Court of Appeals affirmed the trial court's decision to issue a directed verdict in favor of the defendant housing authority. Id. at 843. In support thereof, the court stated that "there [was] no evidence of express authorization by the housing authority for the statements" which were the subject of the litigation. Id.

Accordingly, Dominey's position in and of itself is insufficient to create a genuine issue of material fact as to whether IAP expressly authorized or directed any employee to make statements to a third party regarding the basis of

17

Plaintiff's termination. Furthermore, the Court is unable to find, and Plaintiff has not identified, any other evidence indicating that IAP authorized or directed any of its employees to disclose the contents of Plaintiff's termination letter to any third party. Accordingly, Defendant's motion for summary judgment is **GRANTED** as to Plaintiff's slander claims.

### IV. CONCLUSION

Based upon the foregoing, Defendant IAP World Services, Inc.'s motion for summary judgment (doc. no. 21) is hereby **GRANTED**. The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendant. The Clerk shall terminate all deadlines and motions and **CLOSE** the case.

**ORDER ENTERED** at Augusta, Georgia, this 28th day of March, 2011.

```
_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA
```